CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, Appellant, *v.* JACOB CHIC HECHT, as Trustee of JACOB CHIC HECHT Revocable Living Trust, CECELIA HECHT APPELBAUM, JUAN DEL PRADO dba WORLD MERCHANTS IMPORTERS, LAWYERS TITLE OF LAS VEGAS, INC., NEVADA STATE BANK, CITY OF LAS VEGAS, a Municipal Corporation, Clark County, MARTIN D. HECHT, as Trustee Under the MARTIN D. HECHT Revocable Living Trust Dated September 5, 1989, DONALD HECHT, JACOB HECHT, KEVIN MURPHY dba MICHAEL MENS FASHION, CECELIA APPELBAUM, Trustee in Trust Under the APPELBAUM Family Trust, Dated October 20, 1989, Respondents.

No. 27942

June 3, 1997                                        940 P.2d 127

---

[1]The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.

*Bradford Jerbic*, City Attorney, Las Vegas; *Beckley, Singleton, Jemison & List* and *Daniel F. Polsenberg*, Las Vegas; McDonough, Holland & Allen and *Mark A. Wasser*, Sacramento, California, for Appellant.

*Kermitt L. Waters* and *Laura Wightman FitzSimmons*, Las Vegas, for Respondents.

*Chet Adams*, City Attorney, Sparks; *Shauna M. Hughes*, City Attorney, Henderson; *Richard C. Maurer*, City Attorney, North Las Vegas; *Noel S. Waters*, District Attorney, Carson City, for Amicus Curiae City Redevelopment Agencies.

*Lionel Sawyer & Collins*, Las Vegas, for Amicus Curiae The Fremont Street Experience.

# OPINION

*Per Curiam:*

## FACTS

Respondents Jacob Chic Hecht, as Trustee of the Jacob Chic Hecht Revocable Living Trust; Martin D. Hecht, as Trustee under the Martin D. Hecht Revocable Living Trust dated September 5, 1989; Cecelia Appelbaum, Trustee in Trust, under the Appelbaum Family Trust dated October 10, 1989; Cecelia Hecht Appelbaum; Donald Hecht; and Jacob Hecht (collectively "Hecht") filed a motion to disqualify JUSTICE CLIFF YOUNG from hearing the merits of the underlying appeal based on the grounds of actual bias, implied bias, and/or appearance of impropriety. Respondents base their argument on the fact that JUSTICE YOUNG allegedly harbored a bias against their counsel, Kermitt Waters.

JUSTICE YOUNG and his opponent in the last Nevada Supreme Court election, Judge Steve Jones, were present at an October 9, 1996 Washoe County Bar Association luncheon to answer questions about the upcoming election. Judge Jones was asked whether he would, if he won the election, recuse himself from an appeal pending in the Nevada Supreme Court in which Waters was representing a party who had been awarded $9,000,000 at trial; at that time, Waters had donated $27,882, personally and through his wholly owned corporation, to Jones' campaign. After Judge Jones answered the question, JUSTICE YOUNG stated:

> Regarding the contributions, whether Judge Jones should disqualify himself, it is a matter of Judge Jones to decide from the standpoint of his own conscience. I think that the law limits individuals to $10,000 and corporations to $20,000. It would appear that perhaps Mr. Waters has exceeded to some extent those contributions. As far as other services, I know that recently Mr. Waters has made available two large billboards [for Jones] on top of his office which I presume has not at this time been known to my opponent.

Hecht argues that this statement amounted to an accusation that Waters had committed a crime and, as such, was evidence of JUSTICE YOUNG's actual or implied bias toward Waters; therefore, Hecht argues that JUSTICE YOUNG should be disqualified from hearing the merits in the underlying appeal.

Hecht also argues that JUSTICE YOUNG should be disqualified

from hearing the underlying appeal because the law firm of Lionel Sawyer & Collins represents The Fremont Street Experience, an amicus curiae to this appeal, and JUSTICE YOUNG's son-in-law is a partner in that firm.

We conclude that Hecht's arguments lack merit, and we deny Hecht's motion to disqualify JUSTICE YOUNG.

## DISCUSSION

This court has consistently held that the attitude of a judge toward the attorney for a party is largely irrelevant. Prior to our adoption of the Code of Judicial Conduct (the Code) in 1992, we considered Ainsworth v. Combined Ins. Co., 105 Nev. 237, 259, 774 P.2d 1003, 1019 (1989), in which we had affirmed a punitive damage award of $6,000,000. A petition for rehearing and a motion to disqualify former CHIEF JUSTICE ELMER GUNDERSON were filed based upon Gunderson's participation in the previous decisions in the case. We held that "[g]enerally, an allegation of bias in favor of or against counsel for a litigant states an insufficient ground for disqualification because it is not indicative of extrajudicial bias against the *party*."[1] *Id.* at 259, 774 P.2d at 1019; *see also* In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988). The purpose for such a policy was that:

> In a small state such as Nevada, with a concomitantly limited bar membership, it is inevitable that frequent interactions will occur between the members of the bar and the judiciary. Thus, allegations of bias based upon a judge's associations with counsel for a litigant pose a particularly onerous potential for impeding the dispensation of justice.

*Dunleavy,* 104 Nev. at 790-91, 769 P.2d at 1275. Furthermore, we stated that if a litigant could successfully challenge a judge based upon allegations of bias against counsel for the litigant, "it 'would bid fair to decimate the bench' and lawyers, once in a controversy with a judge, 'would have a license under which the judge would serve at their will.' " *Id.* at 790, 769 P.2d at 1275 (quoting Davis v. Board of School Com'rs of Mobile County, 517

---

[1] In *Ainsworth,* former JUSTICE GUNDERSON openly ridiculed Combined's attorney in court, referred to him in a motion as a "loser" or "losing lawyer" approximately 130 times, and admitted to entering the case with a preconceived negative impression of Combined's counsel. Additionally, Ainsworth's attorney had acted as the campaign manager for former JUSTICE GUNDERSON in one of his campaigns for the Nevada Supreme Court and had represented former JUSTICE GUNDERSON's wife in a previous unrelated venture. Ainsworth v. Combined, 105 Nev. 237, 256-68, 774 P.2d 1003, 1017-25 (1989). In spite of these facts, we denied the motion to disqualify and the petition for rehearing.

F.2d 1044, 1050 (5th Cir. 1975)). This policy still applies, and we continue to believe that to permit a justice or judge to be disqualified on the basis of bias for or against a litigant's counsel in cases in which there is anything but an extreme showing of bias would permit manipulation of the court and significantly impede the judicial process and the administration of justice.

The 1992 adoption of the Code did not vitiate these prior statements of the law concerning jurist disqualification. Canon 2 states the general principle that "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." However, Canon 3(E) of the Code specifically guides the judiciary in matters of disqualification.[2] While Canon 3(E)(1)(a) states that a judge can be disqualified for animus toward an attorney, situations where such a disqualification has been found are exceedingly rare, and non-existent in Nevada. Richard E. Flamm, Judicial Disqualification § 4.4.4, at 124 (1996). "[T]o warrant judicial disqualification—much less other, more drastic sanctions—the judge's bias toward the attorney ordinarily must be extreme. Situations in which judges have manifested such extreme bias toward an attorney are exceedingly rare." *Id.*

In recent cases decided after the adoption of Canon 3(E)(1)(a), notwithstanding the Canon's expansive language, we have reaffirmed the policy that a judge's bias toward an attorney is largely irrelevant. In Valladares v. District Court, 112 Nev. 79, 910 P.2d 256 (1996), Judge Connie Steinheimer was campaigning for election to the bench and sent out two campaign letters very critical of then District Judge Lew Carnahan. The letters made disparaging remarks about Carnahan's ethics, honesty, and competency. Steinheimer won the election, and Carnahan appeared as the attorney for a party before Judge Steinheimer. He requested that she recuse herself from the case, Steinheimer refused, and Carnahan petitioned this court for a writ. In deciding the case, this court stated: "Judge Steinheimer does not possess an actual or apparent bias against Carnahan and therefore need not recuse herself." *Id.* at 84, 910 P.2d at 260.

Additionally, in Sonner v. State, 112 Nev. 1328, 930 P.2d 707 (1996), the prosecutor represented the judge up to the day the prosecutor was to begin prosecuting Sonner in a death penalty case. While this court gives death penalty cases very careful scrutiny, we held that even though the prosecutor had represented

---

[2]PETA v. Bobby Berosini, Ltd., 111 Nev. 615, 895 P.2d 1269 (1995), has been cited for the proposition that a judge should disqualify himself or herself whenever an appearance of impropriety might arise. However, we conclude that the specific disqualification provisions of Canon 3(E), and subsequent case law applying these provisions, should control over the broader statement of Canon 2.

the judge in an unrelated matter up to the time he began his prosecutorial duties in the murder case, there was no reason to conclude that the attorney-client relationship between the judge and the prosecutor in any way affected the judge's ability to be fair and impartial. In the *Sonner* case, substantial weight was given to Judge Wagner's opinion that he could be fair and impartial.

The facts presented in the case at bar do not rise to anything near the level warranting JUSTICE YOUNG's disqualification. The comments made by JUSTICE YOUNG were off-the-cuff remarks made during an election campaign; and they were not nearly as serious as those made in *Ainsworth* and *Valladares,* in which the judges made egregious remarks about counsel for a party, or the situation presented in *Sonner*. JUSTICE YOUNG's comments were based upon the information he had received and merely suggested that Waters *may have* engaged in impropriety. When an attorney enters the fray in a contested judicial election, he or she should anticipate that comments may be made about his or her activities by one side or the other. This is part of Nevada's judicial election process. JUSTICE YOUNG's remarks do not show evidence of a bias toward Waters that would mandate JUSTICE YOUNG's disqualification in this matter.

Additionally, we note that PETA v. Bobby Berosini, Ltd., 111 Nev. 615, 895 P.2d 1269 (1995), a case cited by Hecht, is inapplicable. *PETA* dealt with a judge's connection to a group whose activity was similar to that of a party and not with the relationship of the judge and an attorney for one of the parties. To the extent that *PETA* is inconsistent with this decision, we modify *PETA* accordingly.

We also conclude that JUSTICE YOUNG is not disqualified from hearing this appeal on the ground that his son-in-law is a partner in the Lionel Sawyer & Collins firm, which represents The Fremont Street Experience, an amicus curiae to this appeal. Canon 3(E)(1)(c) of the Code states:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: . . . the judge knows that . . . the judge's . . . child wherever residing, . . . has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.

However, The Fremont Street Experience is not a party to this litigation, and JUSTICE YOUNG's daughter has no direct economic

interest in the subject matter in controversy or any other "more than de minimis" interest that could be substantially affected.

Additionally, Canon 3(E)(1)(d) states:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: . . . a person within the third degree of relationship to [the judge], or the spouse of such a person . . . is acting as a lawyer in the proceeding.

However, we have stated previously that representing an amicus curiae is not the equivalent of representing a "litigant" in an appeal. Ainsworth v. Combined Ins. Co., 105 Nev. 237, 266, 774 P.2d 1003, 1023 (1989). As such, it is clear that representing an amicus curiae is not the equivalent of "acting as a lawyer in the proceeding" pursuant to Canon 3(E)(1)(d), and Hecht's claim must fail. Even if we were to consider the representation of an amicus curiae a function undertaken "in the proceeding," the commentary to Canon 3(E)(1)(d) makes it clear that the attorney at issue must be actually involved in the representation of the amicus curiae, and not just affiliated with the law firm that is providing the representation. Hecht presented no evidence that JUSTICE YOUNG's son-in-law was actually representing The Fremont Street Experience, and therefore, Hecht's claim must fail.

## CONCLUSION

Before a justice or judge can be disqualified because of animus toward a party's attorney, egregious facts must be shown. When reviewing the statement or conduct of a justice or judge made in a campaign setting, reasonable latitude must be given in recognition of the realities of the election process. This is particularly true if the attorney has inserted himself or herself into the contest.

JUSTICE YOUNG's remarks about Waters' donations certainly do not show any disqualifying animus toward Waters. Furthermore, JUSTICE YOUNG is not disqualified by virtue of the fact that his son-in-law is a partner in the law firm that represents an amicus curiae in this appeal. Therefore, Hecht's motion to disqualify JUSTICE YOUNG in this matter is denied.[3]

SHEARING, C. J., ROSE, J., and SULLIVAN, D. J.[4]

---

[3] THE HONORABLE CLIFF YOUNG, Justice, did not participate in the decision of this matter.

[4] The Honorable Jerry V. Sullivan, Judge of the Sixth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE A. WILLIAM MAUPIN, Justice. Nev. Const. art. 6, § 4.

SPRINGER, J., dissenting:

On May 30, 1997, JUSTICES ROSE and SHEARING and Judge Sullivan entered a one-sentence order denying the motions to disqualify JUSTICE ROSE and JUSTICE YOUNG. In response to the May 30 order I filed a twelve-page dissent in which I maintained:

1.  It is improper for JUSTICE ROSE and JUSTICE YOUNG to "take turns" in voting on the other's qualifications. Each is the "swing vote" on the other's case; and I believe that the proper thing for each of them to have done (each being accused of having a bias in this case) would have been to stay out of the decision-making process on the two motions that have been filed to disqualify them.

2.  It is improper for JUSTICE ROSE to continue to sit in this gaming case, given the fact that he is required by law to remove himself from "gaming cases." The subject matter of this litigation is an eminent domain proceeding, the purpose of which is to condemn respondents' property and turn it over to a joint venture "comprised of" ten downtown Las Vegas casinos. JUSTICE ROSE has, as a general rule (with one notable exception[1]), disqualified himself in these kinds of cases. JUSTICE ROSE's insistence upon remaining in *this* case and not in other, similar cases provides, of itself, (without considering the other grounds for questioning his impartiality) grounds upon which his "impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3(E)(1)(d).[2]

---

[1]JUSTICE ROSE is required by law to remove himself in "gaming cases." When hotel-casinos are involved in litigation, JUSTICE ROSE has, for the most part, voluntarily removed himself from such cases; *e.g.,* when the Hilton Hotel and Casino was involved in litigation involving a prize-fight controversy (Hilton Hotels v. Butch Lewis Productions, 107 Nev. 226, 808 P.2d 919 (1991) and Hilton Hotels v. Butch Lewis Productions, 109 Nev. 1043, 862 P.2d 1207 (1993)), and when the Nugget Hotel and Casino was involved in a dispute with a linen service (GNLV Corp. v. Service Control Corp., 111 Nev. 866, 900 P.2d 323 (1995)), JUSTICE ROSE voluntarily disqualified himself. When the Nugget got involved in litigation with Donald Trump, however, JUSTICE ROSE stayed in the case. Trump v. District Court, 109 Nev. 687, 857 P.2d 740 (1993). I cannot discern what criteria are being employed by JUSTICE ROSE in determining when to remain in gaming cases; but I must say that I fail to see any distinction between the cases in which he disqualifies himself and the cases in which he decides not to disqualify himself. To me, *Trump* and the present case, which involves the interests of ten gaming casinos, are indistinguishable from the linen service case and the prize-fight case and other gaming licensee cases in which JUSTICE ROSE has disqualified himself.

[2]Concurring Judge Sullivan takes the rather odd position that "judicial ethics rules," and in particular "Canon 3E," are "irrelevant for this court's consideration in disqualifying a supreme court justice." Thus, Judge Sullivan maintains that "ethics rules are important [only] in each judge's own consideration of whether he or she should disqualify themselves [sic]." Fortunately,

3.  It is improper for JUSTICE ROSE to continue to sit in this case by reason of the extreme prejudice that he has displayed against one of the attorneys for parties who oppose efforts to force them to turn their land over to the "Fremont Experience." JUSTICE ROSE has publicly proclaimed that respondents' attorney is part of a cabalistic "coalition" (in combination with three former chief justices of this court) that is conspiring to defame him and ruin him politically. Still, JUSTICE ROSE unconvincingly insists that he holds no ill-will or bias against this attorney and that he will be able to treat her with justice and equanimity. I do not think so.

4. As appears in the majority opinion, JUSTICE YOUNG's son-in-law is a member of the firm that represents "The Fremont Experience," Lionel, Sawyer and Collins. Ever since his son-in-law became a member of that firm, JUSTICE YOUNG, either because he believed that he was legally disqualified or because he believed that his "impartiality might be reasonably questioned," has voluntarily removed himself from all cases involving this firm. Mr. Samuel Lionel has filed an appearance in this case and, additionally, has filed a petition in this court seeking to overturn the trial court's judgment and obtain a judgment of this court which would allow the condemnation proceedings to be carried out, thus permitting his client, The Fremont Experience, to take possession of the land in question. Similar to JUSTICE ROSE's situation, JUSTICE YOUNG's making an exception, *in this case,* gives rise to an appearance of impropriety and creates a condition under which his "impartiality might reasonably be questioned."

It is not my intention, in this dissenting opinion, to go into the detail that I went into in my May 30 dissent; and those readers who are interested in going into more depth in this matter are invited to examine that document. I file this dissenting opinion in opposition to each of the three-judge majority opinions denying the motions to disqualify JUSTICE YOUNG and JUSTICE ROSE. For present purposes, I find it necessary only to deal, rather cursorily (and curiously), with the explanations given by the majority for its allowing JUSTICES YOUNG and ROSE to continue to sit in this case.

---

"Let your conscience be your guide" is not the standard for judicial qualifications. The Judicial Code of Conduct, enacted by this court, is mandatory, and Canon 3(E) mandates that a "judge *shall* disqualify himself" under conditions set forth in the Code. (Emphasis added.) Judge Sullivan's position does, however, cast an interesting light on these proceedings because it reveals an attitude on the part of at least one member of the three-judge majority that rules of ethics are "irrelevant" when it comes to deciding matters of this kind. One must wonder if the other two members of the majority agree with Judge Sullivan.

1. *The Rose Disqualification: The Majority Incorrectly Holds that Justice Rose's Bias is not so "Extreme" as to Require his Disqualification.* The majority concedes that a disqualification of JUSTICE ROSE may be warranted if his "bias against [the] attorney . . . [is] *extreme.*" (Emphasis added.) I differ with the majority in my understanding of the word "extreme." The majority informs us that JUSTICE ROSE's "comments may have been better not made" and that they were "based on what JUSTICE ROSE had been informed FitzSimmons was *doing against him.*" The majority fully understands that JUSTICE ROSE was, to some degree at least, "out of line" and that JUSTICE ROSE is convinced that Ms. FitzSimmons has been doing things "against him." The majority is also aware of JUSTICE ROSE's public announcement, in a document filed in this appeal, that Ms. FitzSimmons is engaged in a conspiracy with three former chief justices of this court to ruin him. It is difficult for me to understand how JUSTICE ROSE's admitted ill-feeling and bias against Ms. FitzSimmons can be said to be anything other than "extreme."[3]

2. *The Rose Disqualification: The Majority is Incorrect in Relying on the Supposition that Gaming Will not be Conducted on the Condemned Premises.* JUSTICE YOUNG tells us in his majority opinion that no gaming "will be conducted on the condemned

---

[3]In the document filed in this case by JUSTICE ROSE on January 29, 1997, mentioned above, JUSTICE ROSE accuses respondents' counsel, Laura FitzSimmons, of being part of an ongoing conspiracy against him, a conspiracy which he calls the "GUNDERSON/Whitehead/ SPRINGER/STEFFEN coalition." The ROSE document is comprised of a long bill of complaints against Ms. FitzSimmons and against the mentioned conspiratorial coalition, including charges that Ms. FitzSimmons was part of a plan to make public sealed criminal charges that had been filed by a Metropolitan police officer against JUSTICE ROSE, and that, had it not been for Ms. FitzSimmons and her co-conspirators, these charges would have been kept from the public eye and remained "sealed" by order of District Judge Nancy Becker in Las Vegas. Ms. FitzSimmons vehemently denies that she is part of any such conspiracy; but it is obvious from JUSTICE ROSE's January 29 document that he earnestly believes that Ms. FitzSimmons is conspiring to destroy him. In my judgment, these beliefs and the other charges which JUSTICE ROSE makes against Ms. FitzSimmons in his January 29 document create a strong appearance of *extreme* bias on the part of JUSTICE ROSE and lead to the almost inescapable inference that it is impossible for JUSTICE ROSE to sit in impartial judgment in this case while Ms. FitzSimmons is acting as counsel.

I note in passing that JUSTICE ROSE justifies his inflammatory public remarks about Hecht's attorney, Laura FitzSimmons, by saying that they were only "made in response to statements or actions of Laura FitzSimmons" and that his feelings and statements against this attorney were, therefore, "not evidence of any disqualifying bias." With regard to the argument that retaliatory remarks do not count and that JUSTICE ROSE was provoked into doing what he has done, I submit that whatever might have prompted JUSTICE ROSE to behave in the way that he has, his conduct should be "admitted" as "evidence of . . . disqualifying bias" on his part.

property." It does not matter where gaming is eventually conducted; what matters is that this is clearly a gaming enterprise, conjured for the benefit of the ten downtown casinos.

There is nothing obscure or uncertain about this case. A public entity, created for the purpose (the Downtown Development Agency) is to condemn the property in question and turn it over to Mr. Lionel's clients, the Liability Corporation and the Parking Company. Mr. Lionel has told the court that the Corporation, which will ultimately "receive" the condemned property, is "comprised" of gaming casinos. If JUSTICE ROSE disqualifies himself in cases in which gaming casinos are litigating with prize-fight promoters and linen suppliers (see footnote 1), then perhaps he should disqualify himself in a case in which the principal, if not sole, beneficiaries of the litigation are gaming casinos. According to Mr. Lionel, his clients are the "legally aggrieved" parties in this litigation because they have "a right to equitable title to the properties after they are condemned." Whether gaming will be conducted in the garage or in other portions of the condemned property is not of much consequence. The real parties in this case, those who are "legally aggrieved," are gaming licensees. JUSTICE ROSE disqualifies himself in these kinds of cases because he, obviously, considers them to be "gaming cases."

3. *The Young Disqualification: The Majority Opinion Fails to Reckon with the Fact that Justice Young has for a Number of Years Disqualified Himself in All Lionel-Sawyer Cases; Yet Insists Upon Remaining in this One.* The majority opinion claims that JUSTICE YOUNG's disqualification is not required in this case because "Hecht has presented no evidence that JUSTICE YOUNG's son-in-law was actually representing "The Fremont Experience" and no evidence that "JUSTICE YOUNG's daughter has [any] direct economic interest in the subject matter in controversy," (that is to say, the controversy as to whether the ten-casino combine, The Fremont Experience, will be allowed to develop the Hecht property). The answer to this is simple, JUSTICE YOUNG himself has already decided that ethics and propriety demand that he remove himself in all Lionel-Sawyer cases. Whether JUSTICE YOUNG's son-in-law actually works on a Lionel-Sawyer case or his daughter receives some ultimate benefit out of the decision in a case does not matter because JUSTICE YOUNG, himself, has already made the judgment that he must get out of Lionel-Sawyer cases. At last count, JUSTICE YOUNG has removed himself from twenty-one Lionel-Sawyer cases without ever considering the issues upon which the majority opinion relies. Perhaps, from now on, JUSTICE YOUNG intends to sit in Lionel-Sawyer cases unless there is "evidence" that his daughter is going to make some money out

of the case; but I rather doubt it. What should be forthcoming from JUSTICE YOUNG is an explanation as to why he decided to remain in *this* case and this case only. Absent such an explanation, he should retire from the case as he does from all other Lionel-Sawyer cases.

4. *The Young Disqualification: The Majority is Incorrect in Relying on the Premise that "The Fremont Street Experience is not a Party to this Litigation."* Similar to the point that JUSTICE YOUNG's daughter does not stand to make any money out of the Fremont Experience's winning this appeal, the question of whether Mr. Lionel's client, The Fremont Experience, is or is not a party to this appeal is totally immaterial.

As pointed out in my May 30 dissent, Mr. Lionel's clients are interested, if not actual, parties to this appeal. Mr. Lionel, believing that his clients were proper parties to this appeal, filed, *in this appeal,* on behalf of his client, on February 29, 1996, a document entitled "Appearance Pursuant to NRS 37.080 and Opening Brief." Mr. Lionel argued in this document that although his clients were "not named as parties below," they were (already) "in occupation of the property described in appellant's complaint for eminent domain." Later on March 29, 1996, Mr. Lionel filed another document in this appeal, entitled, "Opposition to Motion for Disqualification of JUSTICE ROSE," in which he, not surprisingly, argued that JUSTICE ROSE should remain in the case. Although the record is not clear to me, it seems as though, somehow, Mr. Lionel's documents were "stricken" from the record, so that Mr. Lionel arguably is no longer counsel of record in this appeal (although, I note, the Lionel-Sawyer firm is still on the list of counsel of record in this case and is still served with all documents filed in this appeal). As I have said before, however, it does not make a particle of difference whether, technically, Lionel-Sawyer remains as counsel of record in this case. The point is made by Mr. Lionel himself: His clients are obliged to provide the "financing, leasing and operation of the Fremont Street Experience"; his clients "possess a right to equitable title to the properties under the Agreement, and . . . acquisition of legal title to such properties is essential to the consummation" of the construction and management of the project and the property which is the subject of this appeal. JUSTICE YOUNG should have disqualified himself, as he always does; and this court should have granted the motion to disqualify him.

It is hard not to editorialize on the obvious and to be critical of my colleagues and the court which now permits them to sit in judgment in this case. Rather than say more, I will let the readers of this dissent draw their own conclusions.